RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0360P (6th Cir.)
File Name: 02a0360p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

    *v.*

RAUL PEREZ-GONZALEZ,
    *Defendant-Appellant.*

No. 01-3594

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00151—George C. Smith, District Judge.

Argued: September 20, 2002

Decided and Filed: October 16, 2002

Before: GUY, SILER, AND BATCHELDER, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Gordon Hobson, FEDERAL PUBLIC
DEFENDER'S OFFICE, Columbus, Ohio, for Appellant.
Daniel Allen Brown, ASSISTANT UNITED STATES
ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:**
Steven S. Nolder, FEDERAL PUBLIC DEFENDER'S
OFFICE, Columbus, Ohio, for Appellant. Daniel Allen

Brown, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee.

––––––––––––––––

**OPINION**

––––––––––––––––

ALICE M. BATCHELDER, Circuit Judge. A jury found Defendant Raul Perez-Gonzalez guilty of knowingly transporting illegal aliens within the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). He appeals this verdict, arguing that the district court erred in denying his motion for acquittal under Federal Rule of Criminal Procedure 29. Finding no merit to Perez-Gonzalez's claims, we will affirm the judgment of the district court.

### Statement of Facts

In the early morning hours of August 19, 2000, Ohio State Trooper Timothy Root pulled over an unmarked white Ford van that was driving erratically. While Trooper Root talked with the front-seat passenger, Sanchez, and the driver, Perez-Gonzalez, he shined his flashlight into the rear of the van and saw fifteen people who appeared to be of Hispanic ancestry; some were attempting to hide behind seats and others were partially covered with blankets. The interior of the van looked and smelled as if it had been lived in for a while, on the floor were bottles containing urine, and most passengers had little or no luggage.

Perez-Gonzalez presented Trooper Root with a folder containing commercial registration papers and what was apparently a cargo manifest that listed fifteen Hispanic names with notations that each had paid $250. He explained that he worked for the company that owned the van, and his job was to drive people from Texas to New York as a sort of commercial busing service. He said he did not know anyone in the vehicle apart from Sanchez, who was sharing the driving responsibilities.

license plate; the glass in its passenger-area windows was hazed, preventing others from seeing inside; the van purposely departed late at night; the van took a longer route because that route was less patrolled by the INS than the more obvious route; and the cramped passengers were permitted to get out of the van only in small groups, to avoid creating suspicion. Third, Perez-Gonzalez did not know any of the passengers and they were treated very much like human cargo, even to the extent that their names were listed on a cargo manifest. Finally, even if all of the passengers were traveling "in hopes of finding employment," *id.* at 952, they were also clearly attempting to "evade the law." *Id*. And to the extent that any of these passengers were hoping to find employment, there is no indication that Perez-Gonzalez knew of their hopes, and even if he did, this one factor alone would not outweigh the others. We hold that the district court did not err by denying Perez-Gonzalez's Rule 29 motion.

### Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

Trooper Root could tell from the gas receipts in the folder that the van was traveling to New York by a rather unusual route for a commercial vehicle, journeying from Houston north and west to Oklahoma, and then proceeding northeast. The van—which had hazed glass windows, concealing the occupants—had left in the early morning hours of August 18. After Trooper Root had determined that at least some of the passengers were illegal aliens, he detained the van's seventeen occupants for further investigation. All fifteen passengers were later determined to be illegal aliens.

Perez-Gonzalez was subsequently charged with knowingly transporting illegal aliens. At his trial a special agent from the Immigration and Naturalization Service ("INS") testified that Arkansas, Louisiana, Mississippi, and Alabama—all states that lie in the most direct route between south Texas and New York, and all states which Perez-Gonzalez's route avoided—are more heavily patrolled by the INS than are the states to the north of Texas, and consequently people smuggling illegal aliens frequently choose this northern route.

One of the illegal aliens found in the van, Mauricio Gaono-Gonzalez, testified at trial. He reported that he had taken a previous trip to New York City where he had worked as a painter, then he went to Texas to look for a better-paying job, but because his job in Texas painting building exteriors was too hot and dangerous and he had heard of better jobs available in New York, he had decided to return to New York. He arranged to ride in the van Perez-Gonzalez was driving, and arrived at the departure point at around 8 pm the day before the van left. Though the drivers and passengers were all assembled by 10 pm the following day, the van departed at approximately midnight.

Perez-Gonzalez also testified. He indicated that this had been his first trip as a driver and that he was making $350; he also admitted that though he was told nothing about the passengers before the van departed, during the trip he

suspected that some were illegal aliens.[1] He reported that the late-night departure time and the choice of route had been dictated to him by his superiors, but conceded that he knew that both the departure time and the route had been chosen because they lessened the chances of detection by the INS. He also admitted that when the van made stops during the journey, Sanchez would only allow three or four passengers to get out at a time—fearing that someone would call the police.

During the trial Perez-Gonzalez twice moved for a Rule 29 judgment of acquittal based on the insufficiency of the evidence. The district court denied both motions, and the jury found him guilty. He now appeals the denial of his Rule 29 motions.

### Analysis

We may reverse the jury's verdict on the basis of insufficient evidence only if we conclude, after viewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We may find sufficient evidence "even though the circumstantial evidence does not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

The statute Perez-Gonzalez was convicted under, 8 U.S.C. § 1324(a)(1)(A)(ii), requires the Government to prove that he knowingly transported illegal aliens in the United States "in furtherance of such violation of law." Perez-Gonzalez does not contest the jury's finding that he knew or should have

---

[1] He conceded that he was aware of the problems with illegal aliens in Texas, and indeed he hardly could have alleged otherwise, given that he had worked in a sheriff's department in Texas for five years and had a degree in criminal justice.

known that the passengers were illegal aliens; rather, he argues that no reasonable jury could have found that he transported them "in furtherance of" their illegal presence in the country.

In *United States v. 1982 Ford Pick-Up*, 873 F.2d 947 (6th Cir. 1989), this Circuit considered how to interpret the "in furtherance of" requirement, in the process rejecting an interpretation adopted by the Ninth Circuit because that interpretation was "unable to distinguish between someone who knowingly smuggles illegal aliens across the country from someone who knowingly gives an illegal alien a ride to a shelter for the homeless." *Id*. at 951 (construing *United States v. Moreno*, 561 F.2d 1321 (9th Cir. 1977)). Instead, we adopted an intent-based approach that requires the government to prove "that the defendant wilfully transported an illegal alien with the specific intent of supporting the alien's illegal presence." *Id*. We noted that in discerning this intent, the court should consider all credible evidence, both direct and circumstantial, such as "whether the defendant was compensated for the transportation, . . . what efforts the defendant took to conceal or harbor the illegal aliens . . . [and] whether the illegal aliens were friends, co-workers, or companions of the defendant, or merely human cargo that was being shipped." *Id*. On the facts in *1982 Ford Pick-Up*, we found that the requisite intent was not present: the drivers were not being compensated; they made no attempt to hide the passengers or conceal the fact that they were illegal aliens; the aliens were traveling in hopes of finding employment rather than to evade detection; and the aliens were friends and relatives of the drivers. *Id*. at 951–52.

Looking to the present case, we find that there was sufficient evidence for a reasonable jury to conclude that Perez-Gonzalez wilfully transported illegal aliens with the specific intent of furthering their illegal presence in the United States. First, Perez-Gonzalez was to be compensated in the amount of $350 for his driving. Second, the intent to conceal the passengers is unmistakable: the van—though it was commercial—was entirely unmarked apart from its