**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0340n.06
Filed: May 15, 2009

**No. 08-3884**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| AFRIM MYRTAJ, | ) | |
| | ) | |
| Petitioner | ) | ON PETITION FOR REVIEW |
| | ) | OF AN ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| ERIC H. HOLDER, JR., Attorney General, | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |

**BEFORE: GUY, ROGERS, and GRIFFIN, Circuit Judges.**

**ROGERS, Circuit Judge.** Afrim Myrtaj seeks review of a BIA decision that upheld removability and denied other relief. Immigration authorities charged Myrtaj, then a lawful permanent resident, with attempting to help his brother illegally enter the United States, and sought to remove him. Myrtaj claims that the immigration judge who ruled against him on this issue improperly allocated the burden of proof to him instead of the Government and improperly admitted untrustworthy evidence. After being found removable, Myrtaj sought withholding of removal, asylum, and relief under the Torture Convention; a different IJ rejected these claims. Myrtaj argues that this IJ improperly found that he would not be subject to persecution in Albania due to his political opinions, and that the BIA improperly relied on an updated country conditions report without giving Myrtaj the opportunity to respond when the BIA affirmed the IJ's decision. Because

Myrtaj's claims do not show any reversible error on the part of the BIA, we deny the petition for review.

**I.**

Afrim Myrtaj, a citizen of Albania, came to the United States in approximately 1996. He resided in the United States as a lawful permanent resident, though he returned to Albania for about three weeks in 1999. On April 22, 2000, he met his brother in Montreal, Canada. Myrtaj claims that while in Canada, he told his brother that he could not help the brother illegally enter the United States. Nevertheless, Myrtaj drove his brother to the border and dropped him off near the international boundary. As Myrtaj reentered the United States, customs officials questioned him, and he made some inculpatory statements and signed a sworn statement. Myrtaj later recanted these statements, claiming that he did not properly understand the questions he was asked. But he admitted at his administrative hearing that he knew that his brother did not have a visa, and that he planned to pick his brother up on the United States side of the border if his brother successfully crossed the border. He insisted, nevertheless, that he and his brother did not have a formal plan to have Myrtaj help smuggle his brother into the country.

The immigration judge at Myrtaj's first hearing did not explicitly make a credibility finding. However, the IJ made factual findings, based on all of the evidence, that Myrtaj "knew that his brother wanted to come into the United States, . . . knew that his brother did not have the authority to come into the United States, . . . actually transported his brother to the border . . . dropped him off

and knew that his brother was going to enter the United States . . . and based upon the actions of [Myrtaj] and his admissions, it is clear that he intended to pick up his brother afterwards. . . ."

After making these findings, the IJ stated that "[Myrtaj] has not satisfactorily rebutted the testimony of the Government's witnesses or its written documents including his own sworn statement and, therefore, the Court finds that [Myrtaj] has been found . . . to have violated § 212(a)(6)(E)(i) of the Act and, therefore, is found to be removable from the United States by clear, convincing and otherwise unequivocal evidence."

While this language, from the IJ's opinion, appears to state correctly the burden of proof, the IJ stated the burden of proof incorrectly near the beginning of the hearing. He stated that "[f]or an arriving alien the burden of proof is on the respondent to show that he's not inadmissible under the United States law." That statement is incorrect, the Government concedes, because Myrtaj was a lawful permanent resident. Nevertheless, immediately after making the statement, the IJ required the Government to put on its case. Throughout the proceedings, the IJ made several more statements about burdens of proof. *See* A259-60, 328-34.

After being found removable, Myrtaj applied for asylum, withholding of removal, and protection under the Torture Convention. At a second hearing, Myrtaj testified that he "believes his life would be in danger if he returns to Albania from socialist or terrorist groups." Myrtaj had joined a democratic party in Albania in 1991, and had opposed the then-communist government. He claimed that he was arrested three times in 1991 in connection with his political activity, and held overnight and beaten twice. He further claimed that he was attacked and beaten once in 1993 and

once in 1995 by three members of "a gang of socialist party members," but that he did not report these attacks to the police because he believed that doing so would be futile.

He testified that his brother, who was deported to Albania in 2006, was shot in the leg because of the brother's support for the democratic party. Myrtaj admitted that the democratic party had won recent elections in Albania, but claimed that he still feared the socialist-affiliated individuals who attacked him. He also admitted that he had voluntarily returned to Albania for three weeks in 1999 without incident. Further, he admitted that he lived with his parents, who had overstayed their tourist visas and were in the United States illegally.

The IJ at the second hearing explicitly found Myrtaj to be "a generally credible witness," though the IJ noted that Myrtaj had failed to produce "reasonably available corroboration." The IJ went on to find that even crediting Myrtaj's testimony, Myrtaj had not established his entitlement to relief. The 1991 arrests and beatings were not "persecution under U.S. asylum law," and even if they were, were not likely to recur due to changed country conditions. Myrtaj presented insufficient evidence to enable the IJ to conclude that the 1993 and 1995 attacks "were by individuals that the government of Albania at the time was unwilling or unable to control." Myrtaj did not demonstrate a reasonable fear of future persecution because country conditions had changed, and because Myrtaj had voluntarily returned to Albania without incident in 1999. As for the 2006 shooting of Myrtaj's brother in Albania, "it is not at all clear from the record of evidence by whom or why" he was shot. Myrtaj "unfortunately faces the same risk of sad violence that any other member of Albanian society may face in that country today," but that risk was an insufficient basis to grant asylum.

The IJ noted that Myrtaj's failure to meet his burden on the asylum issue necessarily meant failure on his request for withholding of removal. The IJ further noted that Myrtaj had neither shown evidence of past torture nor shown a reasonable possibility of future torture in Albania, and thus denied relief under the Convention Against Torture.

The BIA adopted and affirmed "the" decision of "the" IJ. While the BIA used the singular in so holding, it discussed the opinions of both IJs, and appears to have adopted both. While upholding the second IJ's opinion, the BIA cited a State Department report on Albania to show changed country conditions. That report was issued after Myrtaj filed his brief with the BIA.

Myrtaj now petitions for review.

## II.

### A. Burden of Proof at the First Hearing

While some of the IJ's comments at the first hearing regarding the burden of proof were erroneous, they do not justify a remand. Even if the IJ's statements at the hearing were erroneous, his legal reasoning in his order was not, the Government met the correct burden of proof, and the IJ's actions during the hearing showed an acceptable handling of the case.

In alleging that Myrtaj was removable, the Government had to prove by "clear, unequivocal, and convincing evidence" that he had attempted to help his brother illegally enter the country. *See Tapucu v. Gonzales*, 399 F.3d 736, 738 (6th Cir. 2005). The IJ misstated this burden at the hearing at least once. But other statements about the burden of proof show that the IJ considered the entire burden of proof discussion to be more about the order of presentation of evidence than about who

bore the ultimate burden of persuasion. Particularly of note is the IJ's statement to the Government's attorney that "what I was trying to tell you by putting in your evidence I was basically saying that you had the burden of proof and you introduced it. Then it was up to [Myrtaj] to come back and rebut it."

The IJ's actions at the hearing largely conformed to this statement—he required the Government to put on evidence of Myrtaj's misconduct, invited rebuttal by Myrtaj, and allowed the Government a chance to respond further. That pattern strongly resembles the normal pattern at a trial in which the government bears the burden of proof. Moreover, the IJ's statement in his findings that Myrtaj "has not satisfactorily rebutted the testimony of the Government's witnesses or its written documents," is at worst ambiguous with respect to the burden of proof issue of which Myrtaj now complains. That remark might imply that the IJ thought that Myrtaj had to prove affirmatively his entitlement to remain in the country, but it can more easily be read to mean that Myrtaj failed to overcome the prima facie case the Government had made. The record ultimately does not suggest that Myrtaj was required to prove affirmatively his entitlement to remain; rather, it appears to show Myrtaj's failure to overcome the strong case that the Government made that he violated the Act.

Moreover, the BIA adopted only the IJ's decision, as opposed to every statement made by the IJ during a hearing. Thus, Myrtaj would have to point to error in the IJ's reasoned decision, not to any stray error the IJ made during the entire proceedings. This he has not done.

Upholding the BIA decision moreover does not violate the principle that a court should not "enforce the [agency]'s order by applying a legal standard the [agency] did not adopt." *See N.L.R.B.*

*v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 721 (2001). Nothing in the record suggests that the BIA has adopted any standard other than the proper one in allocating burdens of proof in cases such as this, nor does anything suggest that the BIA would not reverse if an IJ not only misstated but misapplied the law.

Because the IJ's misstatements regarding the burden of proof do not appear to have corrupted the proceedings or his reasoned opinion, and because the BIA did not adopt these misstatements, remand is not warranted on this issue.

## B. Admission of Evidence at the First Hearing

Myrtaj claims that admission of certain evidence violated his due process rights. He claims that the IJ should not have admitted the reports of the officers who questioned him on the day of the incident at the border because of discrepancies as to when the reports were written, and because the officers questioned him in English. This claim is quite doubtful. We noted in *Singh v. Ashcroft*, 398 F.3d 396, 406-07 (6th Cir. 2005), that the Federal Rules of Evidence do not apply to immigration proceedings, so appellate courts review IJ evidentiary rulings only to ensure that IJs do not violate due process. Admission of the challenged evidence was not fundamentally unfair because the statements petitioner reportedly made were substantially the same as the statements petitioner made in the interview that was conducted with the aid of an interpreter.

## C. Myrtaj Admitted Facts Establishing His Offense

To make its case, the Government had to prove that Myrtaj "knowingly [had] encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in

violation of law." 8 U.S.C. § 1182(a)(6)(E)(i). Myrtaj argues that the Government's evidence was not sufficient to prove this. But his own admissions at the hearing show otherwise.

Myrtaj testified at the hearing that he knew that his brother could not legally enter the United States. Myrtaj also knew that his brother wanted to enter the United States illegally before Myrtaj went to Canada to meet his brother. Myrtaj admitted that he drove his brother to the border knowing that the brother was going to try to enter the United States illegally. And Myrtaj admitted that if his brother had phoned him after illegally crossing the border, Myrtaj would have picked his brother up. Even though Myrtaj refused to give further aid to his brother, Myrtaj gave sufficient "aid" and "assist[ance]" to fall within the proscription of the statute. Transporting someone to and from the border can facilitate illegal entry even if the alien smuggler keeps his distance during the actual crossing.

*Tupucu*, the case on which Myrtaj mainly relies, is not to the contrary. There we held that "openly presenting an alien to border officials with accurate identification and citizenship papers" did not amount to a violation of the anti-smuggling statute. 399 F.3d at 737. The IJ had attempted to exclude the alien in that case because the alien was driving the van in which the would-be illegal immigrant was riding, the alien knew the attempted immigrant had been living in the United States, and the alien did not correct the attempted immigrant's misstatement to border officers. *Id.* at 738. We vacated and remanded because the alien thought the attempted immigrant could legally reenter the United States. *Id.* at 739. We noted that the group made "no effort to cross the border at a place

where there were no border guards." *Id.* Myrtaj's brother, on the other hand, did attempt a secretive crossing.

Myrtaj's complaint that the IJ did not make a credibility finding with regard to his testimony is thus largely irrelevant. His testimony, if fully credited, supports the Government's position. The evidence supporting Myrtaj's removability for alien smuggling is sufficient.

**D. Asylum Claim—Past Persecution**, **Future Persecution, and Changed Country Conditions**

Myrtaj argues that the 1991 arrests and beatings by the Albanian government amount to past persecution. Assuming for the sake of argument that Myrtaj had established past persecution based on the 1991 arrests/beatings (contrary to the findings of the IJ and BIA), Mytraj's claim for relief nonetheless fails because the Government showed that conditions have changed in Albania.

A showing of past persecution creates a presumption that Myrtaj would be subject to future persecution in Albania. 8 C.F.R. § 1208.13(b)(1). However, a showing of changed country conditions rebuts that presumption. *Id.* § 1208.13(b)(1)(i)(A). The record supports the IJ's findings that conditions have changed in Albania since 1991.

A Department of State report released in 2006 noted that the 2005 elections "did not fully comply with international standards . . . but were generally considered a step forward in the country's democratic development." While that report notes allegations of police beating of detainees, none of the alleged incidents appears to involve police targeting of former democratic party members. Moreover, "[t]here were no reports of political detainees" and "no reports of political prisoners." In addition, "[i]ndividuals could freely criticize the government and its actions in print and

broadcasts." "The law provides for freedom of assembly, and the government generally respected this right in practice." Myrtaj submitted this report with his application for asylum, and the IJ was entitled to consider it in concluding that country conditions had changed. The IJ could reasonably find that the Government rebutted the presumption of future persecution applicable due to 1991 communist government persecution since the evidence suggested that the democratic government did not engage in or tacitly approve such persecution, particularly of its supporters.

For similar reasons, the IJ permissibly found that Myrtaj did not have a well-founded fear of future persecution. The democratic government had taken power, and Myrtaj gave little reason to believe that after a decade out of the country he would be subject to persecution upon his return. Moreover, Myrtaj voluntarily returned to Albania for three weeks in 1999, casting considerable doubt on his supposed fear of returning.

Myrtaj's complaint that the BIA did not allow him to respond to the 2007 State Department report on Albania that it cited in its opinion shows harmless error at most. The cited portions of the 2007 report do not differ materially from the 2005 report that Myrtaj himself entered into evidence. Myrtaj does not explain what aspects of the report he believes to be inaccurate, or how he would have contested them if the BIA had given him a chance to respond. A formalistic remand to allow the BIA to revise its opinion or to give Myrtaj a chance to respond before reissuing the same opinion would serve little purpose.

For these reasons, relief with respect to the asylum claim is not warranted.

**E. Discretionary Asylum**

Myrtaj also argues for discretionary asylum should he lose "on the removal issue." He does not explain under what provision of the law he makes this argument. He may be arguing under 8 U.S.C. § 1182(d)(11), which gives the Attorney General discretion to waive the application of the anti-smuggling provision that Myrtaj violated, but that provision is only applicable for aliens who hoped to help a "spouse, parent, son, or daughter (and no other individual)" illegally enter the United States. In any event, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review of this type of denial of discretionary relief.

**F. Withholding of Removal**

Myrtaj's failure to establish eligibility for asylum necessarily means he has failed to establish eligibility for withholding of removal. *See Liti v. Gonzales*, 411 F.3d 631, 641 (6th Cir. 2005).

**G. Convention Against Torture**

Myrtaj's Torture Convention claim fails largely for the same reasons his claim to fear future persecution fails—he does not establish any reasonable probability that the current government of Albania has any interest in torturing him based on his support of the democratic party in Albania over a decade ago. *See Sarr v. Gonzales*, 485 F.3d 354, 362 (6th Cir. 2007); *Ramaj v. Gonzales*, 466 F.3d 520, 532 (6th Cir. 2006). The BIA's finding that Myrtaj did not carry his burden on this issue does not warrant reversal.

### III. Conclusion

The BIA's findings must be treated as conclusive unless the record compels a contrary result. *Liti*, 411 F.3d at 636-37. The record does not so compel here, and we therefore deny the petition for review.